UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,

         - against -

MICHAEL GRIMM,

                     Defendant.
------------------------------------------------------x

**MEMORANDUM & ORDER**
14-CR-0248 (PKC) (RML)

PAMELA K. CHEN, United States District Judge:

On April 25, 2014, a grand jury returned a sixteen-count indictment charging Defendant Michael Grimm with various tax, wire, mail, and health care fraud crimes.  (Dkt. 1.)  Grimm ultimately pled guilty to the felony of aiding and assisting in the preparation of false and fraudulent tax returns in violation of 26 U.S.C. § 7206(2).  (*See* 12/23/2014 Min. Entry; Plea Agreement, Dkt. 83.)  On July 17, 2015, the Court sentenced Grimm to eight months' imprisonment to be followed by one year of supervised release, and restitution in the amount of $148,907.11.  (*See* 7/17/2015 Min. Entry, Dkt. 105; Am. J., Dkt. 112, at 1–4.)  On May 28, 2025, Grimm received a pardon from President Donald J. Trump.  (Mot. to Vacate J. & Dismiss Indictment ("Mot. to Vacate"), Dkt. 125, at ECF[1] 1, 6–7 (pardon by President Donald J. Trump granting Grimm "A Full and Unconditional Pardon"); *see also* https://www.justice.gov/pardon/media/1401966/dl?inline (publicly available posting of the pardon).  Now proceeding *pro se*, Grimm moves to vacate the judgment in this case and to dismiss the indictment against him.  (Mot. to Vacate, Dkt. 125, at ECF 1.)  For the reasons stated below, Grimm's Motion is denied.

---

[1] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

**BACKGROUND**

A factual statement signed by Grimm and filed in conjunction with his guilty plea details the conduct that gave rise to the criminal charges against him.  ("Factual Basis for Guilty Plea," Dkt. 82.)    As described in that statement, Grimm, in his role overseeing a restaurant called "Healthalicious," under-reported payroll and sales in order to avoid state and federal taxes, concealing over $900,000 of the restaurant's gross receipts.  (*Id*.  ¶¶ 1–3.)  In an attempt to cover up this scheme, Grimm lied under oath during a 2013 civil deposition, claiming, *inter alia*, that the Healthalicious employees had not been paid in cash and that he generally did not correspond via email about the restaurant's business.  (*Id*. ¶ 10.)  As a result of his conduct, Grimm "caused federal and New York State tax and [New York State Insurance Fund] premium losses of more than $80,000 and less than $200,000."  (*Id*. ¶ 8.)

On December 23, 2014, Grimm pled guilty pursuant to a plea agreement with the Government to one count of aiding and assisting in the preparation of false and fraudulent tax returns under 26 U.S.C. § 7206(2).  (*See* 12/23/2014 Min. Entry; Plea Agreement, Dkt. 83.)  On July 17, 2015, the Court sentenced Grimm to eight months' incarceration to be followed by one year of supervised release, a $100 special assessment fee, and restitution in the amount of $148,907.11, along with $290.10 in court fees.  (*See* 07/17/2015 Min. Entry, Dkt. 105; Am. J., Dkt. 112.)

Nearly a decade later, on May 28, 2025, Grimm received a "full and unconditional" presidential pardon "[f]or the offenses against the United States individually enumerated" in this case. (Mot. to Vacate, Dkt. 125, at ECF 6–7.)  Grimm also reports that in 2024, he suffered an accident that left him paraplegic, which now presents "substantial challenges" to his daily tasks and "ability to earn a living." (Def.'s Letter, Dkt. 127, at ECF 1.)  Based on these events, Grimm now requests that the Court vacate the judgment in this case and dismiss the government's

2

indictment against him.  (*See generally* Mot. to Vacate, Dkt. 125.)  Without providing details, he states that granting his Motion "would materially assist [him] in pursuing gainful employment and rebuilding [his] life."  (Def.'s Letter, Dkt. 127, at ECF 1.)  On January 23, 2026, the Court directed Grimm "to make an additional filing as to his motion, further providing the factual and legal basis for his request," and granted leave for the government to make its position known.  (01/23/2026 Dkt. Order.)  On March 16, 2026, having received no response from either Grimm or the Government, the Court *sua sponte* granted an extension of time for both to respond.  (*See* 03/16/2026 Dkt. Order.)  To date, neither party has responded.

## DISCUSSION

### I.    The Effect of a Presidential Pardon

Grimm's Motion argues that because he has received a presidential pardon, and that pardon "removes all legal consequences of the conviction," "the judgment of conviction should be vacated [and] the indictment dismissed."  (Mot. to Vacate, Dkt. 125, at ECF 1.)  At its core, Grimm's argument presents questions as to how far a presidential pardon goes in invalidating a decision reached through the criminal justice system and, in effect, by the judicial branch.  Examining the history and precedents with respect to the effects of a pardon, the Court disagrees with Grimm's conclusion that a presidential pardon requires the Court to vacate his judgment of conviction and dismiss the adjudicated indictment against him.

In one of the earliest opinions examining the presidential pardon, Chief Justice John Marshall wrote that a pardon "is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual on whom it is bestowed, from the punishment the law inflicts for a crime he has committed."  *United States v. Wilson*, 32 U.S. 150, 160 (1833).  Subsequent case law confirms that the pardon ensures that the legal system may not use the conviction to punish the receiver.  *See Schick v. Reed*, 419 U.S. 256, 273 n.8 (1974) ("[A] pardon

3

is an act of public conscience that relieves the recipient of all the legal consequences of the conviction." (collecting authorities)).

But the effect of the presidential pardon is not without limits. For instance, a pardon does not preclude consideration of the conduct supporting the underlying conviction by the bar in a disciplinary proceeding, *see In re Abrams*, 689 A.2d 6, 13–16 (D.C. 1997) (collecting federal and state cases); *Grossgold v. Sup. Ct. of Illinois*, 557 F.2d 122, 126 (7th Cir. 1977); in professional licensing requirements, *see Hirschberg v. Commodity Futures Trading Comm'n*, 414 F.3d 679, 684 (7th Cir. 2005); or in sentencing enhancements for other crimes (unless the pardon is explicitly grounded in a finding of innocence), *see United States v. Munoz-Gonzalez*, 812 F.3d 439, 442 (5th Cir. 2016) (citing *Carlesi v. New York*, 233 U.S. 51, 59 (1914)); *United States v. Salas*, 387 F.2d 121, 122 (2d Cir. 1967). *See also* Samuel Williston, *Does a Pardon Blot Out Guilt?*, 28 Harv. L. Rev. 647, 650–51, 657 (1915) (examining the history of the pardon and concluding that "while the pardon dispenses with punishment, it cannot change character, and where character is a qualification for an office, a pardoned offence as much as an unpardoned offence is evidence of a lack of the necessary qualification"). In addition, as relevant here, a pardon must first be accepted by the recipient to be valid. *See Burdick v. United States*, 236 U.S. 79, 89 (1915).

Although language in the Supreme Court's decision in *Ex Parte Garland*, 71 U.S. 333 (1866) suggested that the effect of a pardon could be extremely broad, subsequent case law has rejected that view. In *Ex Parte Garland*, Justice Stephen Johnson Field, included the following language, in dictum:

> A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. . . . [I]f granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.

4

*Id*. at 380–81.[2]  By stating that a pardon "blots out the existence of guilt," *Ex Parte Garland* seems to indicate that a pardon operates to nullify a conviction as though it had never taken place, which in turn suggests that a court should do away with the entire case by dismissing the underlying indictment.  But that interpretation of *Ex Parte Garland* has since been rejected.[3]  In *Burdick*, the Supreme Court (again in dictum) explicitly referenced the "confession of guilt implied in the acceptance of a pardon."  236 U.S. at 90–91; *see id.* at 94 ("[A presidential pardon] carries an imputation of guilt; acceptance a confession of it.").  And, in *Nixon v. United States*, the Supreme Court made clear that "the granting of a pardon is in no sense an overturning of a judgment of conviction by some other tribunal; it is '[a]n executive action that mitigates or sets aside *punishment* for a crime.'"  506 U.S. 224, 232 (1993) (quoting Black's Law Dictionary 1113 (6th ed. 1990)); *see also In re Kelsey*, No. 23-90034-AM, 2025 WL 3750395, at *1 n.2 (2d Cir. Dec. 29, 2025) (summary order) (Order of Grievance Panel collecting cases rejecting the idea that a pardon reaches the guilt imputed by criminal judgment).[4]

---

[2] The Supreme Court in *Ex Parte Garland* considered the constitutionality of an 1865 federal law requiring attorneys practicing in federal courts to take an oath that they had not supported the rebellion.  71 U.S. at 374–75.  The law effectively excluded Confederate officers from practicing in federal courts, as they could not take the oath without perjuring themselves.  In particular, the Court considered the case of Augustus Garland, a former Confederate officer who had received a presidential pardon for his service to the Confederacy.  *Id.* at 375.  The Court ruled in Garland's favor on two independent grounds.  It held that the law was facially unconstitutional as a bill of attainder and an *ex post facto* law in violation of Article I, Section 9, *id.* at 377–78, and that, in any event, Garland's pardon precluded Congress from requiring that he take the oath because doing so would improperly impose a continued punishment for the acts for which he was pardoned, *id.* at 381.

[3] Indeed, were that passage given its full effect, it would logically conflict with the aforementioned caselaw that followed *Ex Parte Garland* and permits the consideration of the underlying conduct in a variety of circumstances.

[4] Some have posited that the language in *Ex Parte Garland* should be read only to apply to pardons that specifically reach innocence.  *See* Henry Weihofen, *The Effect of a Pardon*, 88 U. Pa. L. Rev. 177, 178–80 (1938); Michael F. Welch, Note, *The Effect of a Pardon on License Revocation and Reinstatement*, 15 Hastings L.J. 355, 356 (1964).  This argument does not help

Turning to the more specific context of a pardon's interference with the judicial management of otherwise closed cases, the Court finds that the presidential pardon does not justify the result Grimm requests.  In an oft-cited and closely related decision, the Third Circuit in *United States v. Noonan* rejected the defendant's position that his presidential pardon for a violation of the Selective Service Act required a federal court to expunge the records of his prosecution and conviction.  906 F.2d 952, 960 (3d Cir. 1990).  That court based its reasoning on an extensive examination of the pardon power's history and the Constitution's text, paying particular attention to the potential conflicts with Article III that would be engendered were the Executive Branch to dictate which court records the judiciary could or could not maintain.  *See id.* at 956 ("[T]he notion that the President has the ability, through the pardon power vested under Article II, § 2, to tamper with judicial records is a concept jurisprudentially difficult to swallow. . . . It is beyond cavil that the maintenance of court records is an inherent aspect of judicial power.").

Other courts have taken similar approaches to the Third Circuit in *Noonan*.  *See, e.g.*, *United States v. Arpaio*, No. 16-CR-1012-1 (PHX) (SRB), 2017 WL 4839072, at *2 (D. Ariz. Oct. 19, 2017) (denying motion for vacatur of rulings in a criminal case, the underlying conduct for which the defendant had been pardoned, after the court found defendant guilty but before entry of judgment, and describing a pardon as "an executive prerogative of mercy, not of judicial record-keeping" (quoting *Noonan*, 906 F.2d at 955)), *aff'd*, 951 F.3d 1001 (9th Cir. 2020); *Hirschberg*, 414 F.3d at 682 ("A pardon in no way reverses the legal conclusion of the courts; it 'does not blot out guilt or expunge a judgment of conviction.'"  (quoting *In re North*, 62 F.3d 1434, 1437 (D.C.Cir.1994))); *United States v. McMichael*, 358 F. Supp. 2d 644, 647 (E.D. Mich. 2005) ("A

---

Grimm, however, since his pardon does not mention or suggest that he is innocent of the crime to which he pled guilty.

pardon does not entail the expungement of judicial records or otherwise negate the facts of the underlying conviction." (citing *United States v. Doe*, 556 F.2d 391 (6th Cir. 1977)); *Borders v. United States*, No. 12-CV-0502 (JEC) (LTW), 2012 WL 2088961, at *1 (N.D. Ga. June 8, 2012) ("[The pardoned individual] has cited no case where a federal court vacated a federal criminal conviction because of a presidential pardon, and the Court has found no such case. . . . [F]ederal courts have refused to expunge the record of criminal convictions on the basis of presidential pardons, which is a less drastic remedy than the outright vacatur of a conviction that [the pardoned individual] seeks here."); *see also United States v. Buenrostro*, 895 F.3d 1160, 1166 (9th Cir. 2018) ("Like a full pardon, a presidential commutation does not overturn the sentence imposed by the sentencing court . . . A presidential commutation does not invalidate the prior court-imposed judgment . . . 'The granting of a pardon is in no sense an overturning of a judgment of conviction by some other tribunal.'" (quoting *Nixon*, 506 U.S. at 232)). Today, the Court joins them, finding the reasoning of these decisions to be persuasive and no controlling authority guiding it to the contrary conclusion.

Thus, the Court finds that the presidential pardon that Grimm received does not require the vacatur of Grimm's conviction or the dismissal of his indictment.

## II.     Other Grounds for Vacatur and Dismissal

Grimm also notes, in this request to the Court, that the relief sought "would materially assist [him] in pursuing gainful employment and rebuilding [his] life." (Def.'s Letter, Dkt. 127, at ECF 1.) To the extent Grimm seeks to invoke equity as a basis for his request, the Court finds that it lacks the authority to grant Grimm's requested post-conviction relief on the basis of equity alone, and thus denies it. *See Doe v. United States*, 833 F.3d 192, 199 (2d Cir. 2016) (relying on *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) to conclude that courts lack subject-matter jurisdiction over motions to expunge a final conviction where requested relief was

7

based solely on negative impacts of conviction, rather than the limited circumstances carved out in *Kokkonen*); *Tonge v. United States*, No. 24-MC-2597 (NRM), 2025 WL 3485194, at *2 (E.D.N.Y. Dec. 4, 2025) (collecting cases); *see also Yearwood v. United States*, No. 18-MC-1835 (KAM), 2022 WL 4662091, at *2 n.3 (E.D.N.Y. Sep. 30, 2022) (noting that individuals whose convictions are final "may be able to take advantage of protections under state and local law" (citations omitted)).  Even if that were not the case, Grimm's sole statement is entirely conclusory and fails to demonstrate how the conviction and indictment impact his job prospects.

### CONCLUSION

Because Grimm is not entitled to vacatur of his conviction or dismissal of the indictment pursuant to his presidential pardon, and because the Court lacks jurisdiction to consider his request on an equitable basis alone, Grimm's motion is denied in full and the case will remain closed.

SO ORDERED.

/s/ *Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  June 16, 2026
         Brooklyn, New York

8